# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 8, 2011

## HECTOR ALONZO v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### No. 2000-D-1876    J. Randall Wyatt, Jr., Judge

### No. M2010-00097-CCA-R3-PC - Filed August 30, 2011

The Petitioner, Hector Alonzo, appeals pro se from the denial of post-conviction relief by the Criminal Court for Davidson County. He was convicted by a jury of conspiracy to possess with intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone, a Class A felony.[1] The petitioner was sentenced to fifteen years in the Tennessee Department of Correction. On appeal, he claims: (1) he received ineffective assistance of counsel; and (2) the trial court abused its discretion by prohibiting him from raising a selective prosecution claim. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ. joined.

Hector Alonzo, Tiptonville, Tennessee, Pro Se.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Tammy Meade, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

---

[1] The record does not include the judgment form. This information is based on this court's decision from the petitioner's direct appeal. See State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *1 (Tenn. Crim. App., at Nashville, Oct. 7, 2005).

**Background**. The petitioner and several co-defendants were charged with conspiracy to possess with intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone. The charges related to an undercover drug purchase conducted by the Tennessee Bureau of Investigation ("TBI") and the Metropolitan Nashville Police Department. The petitioner and five co-defendants were tried together in a single jury trial.[2] The underlying facts of this case were set forth by the Tennessee Supreme Court on the petitioner's direct appeal:

On April 18, 2000, Jose Rodriguez ("Rodriguez"), who had been arrested for drug offenses, informed TBI Agent Howell and other officers that the suppliers of his illegal drugs could be found at two locations, 1035 and 1147 Antioch Pike in Nashville, Tennessee. In cooperation with the police, Rodriguez telephoned his supplier, "David," who was later identified as Romero, and arranged to buy one hundred pounds of marijuana at a carwash on Nolensville Road. Officers with the TBI and the Metropolitan Police Department cooperated in the investigation.

Police Detective Jessie Birchwell and approximately fourteen other officers established surveillance at both of the Antioch Pike houses and also at the Nolensville Road carwash. Detective Birchwell observed two men in a white Toyota Camry meet Rodriguez at the carwash. The driver, who was wearing a white football jersey and was later identified as Romero, got out of the Camry and entered Rodriguez's car. Meanwhile, a man in a gray van was parked nearby. He appeared to be talking on a radio. When Romero left the Rodriguez vehicle and drove away in his Camry, the gray van remained at the carwash.

About thirty minutes later, Romero and a passenger later identified as Hernandez returned to the carwash in the same Camry. They were followed by a white Ford Taurus. A black Pontiac Firebird occupied by two Hispanic males was driven into a nearby parking lot. The individuals in the Firebird had an "unobstructed view" of the carwash. When an officer who had been monitoring Rodriguez's conversation with his suppliers gave the "take down" signal, Detective Birchwell drove into the carwash and was able to arrest Romero, who had tried to flee. Hernandez remained in the Camry. A loaded handgun and a walkie-talkie were found in their vehicle.

Vasques fled from the white Taurus and ran toward Nolensville Road before being tackled by Officer Rob Forrest. A loaded handgun was found in

---

[2]Several other co-defendants entered plea agreements.

a carwash bay near where Vasques had run. Alonzo, who was seated on the passenger side of the Taurus, was taken into custody by Detective John Donnegan. Three trash bags in the trunk of the Taurus and another on the ground behind the vehicle contained approximately one hundred pounds of marijuana. By the time the four men had been arrested, the gray van had been driven from the scene.

During the period of surveillance, Police Officer Herbert Kajihara watched the Firebird traveling slowly through a Dairy Queen parking lot before it was parked in a Burger King parking area within view of the carwash. The vehicle's occupants, whom Kajihara described as "slouched" down in their seats and "looking back and forth," stayed in the car. When the take-down signal was given, Kajihara approached the Firebird, which Detective Leon Taylor had blocked with his car. The suspects in the Firebird, who were later identified as Garza and Vasquez, made no effort to avoid arrest.

At trial, Detective Taylor testified that prior to the arrests, he had followed the Camry from the carwash to a Walgreens at the corner of Antioch Pike and Nolensville Road. The Camry was met there by the white Taurus. Detective Taylor continued to watch as the Taurus was driven from the parking lot and proceeded along Antioch Pike before being returned to the Walgreens some ten minutes later. The black Firebird followed the Taurus. Taylor assisted in the arrest of Garza and Vasquez. Although a loaded shotgun was found behind the front seat of the Firebird, Taylor found no evidence of illegal drugs in the vehicle.

TBI Agent Howell, who was involved in the initial arrest of the informant Rodriguez and was a part of the surveillance team near the carwash, witnessed the black Firebird being parked in the Dairy Queen parking lot. According to Agent Howell, the Firebird's occupants left the Dairy Queen after glancing toward the carwash and then parked near the Burger King. He described the two men as continuously looking straight ahead and observed that neither left the vehicle. Agent Howell, who did not participate in the arrests, identified Vasquez and Garza as the occupants of the Firebird.

Metropolitan Police Officer Thomas Rollins likewise testified that shortly before the arrests, he saw the Taurus occupied by Hispanic males enter the driveway at 1147 Antioch Pike. He saw the driver knock on the door and stand there for a few minutes before returning to his vehicle and driving to 1035 Antioch Pike. No one got out of the car at that location. Shortly

thereafter, two Hispanic males arrived in the black Firebird, got out of their vehicle, and walked toward the back of the residence. The Taurus left the residence first and the Firebird followed, each being driven to the Walgreens where the Camry was already parked.

Metropolitan Police Detective Mike Clark, who had also provided surveillance at the carwash, trailed the Camry from the carwash to the Walgreens. At trial, Clark testified that as the two cars traveled from the residences on Antioch Pike toward the Walgreens, they passed by Glencliff Elementary School, Glencliff High School, and Wright Middle School. He measured the distance from Glencliff Elementary School to Antioch Pike at 200 feet and he determined that Glencliff High School was 202 feet from the road. The officer testified that Wright Middle School was 222.6 feet from Antioch Pike and that the Walgreens was only eighty-one feet from Radnor Baptist Elementary. He also concluded that Radnor Baptist Elementary was "just shy" of one thousand feet from the carwash.

Following the arrests of the defendants, the officers obtained a search warrant for the houses located at 1035 and 1147 Antioch Pike. At the 1035 Antioch Pike address, they found a safe containing money, electronic scales, marijuana, ammunition, a loaded handgun magazine, and a box to a Glock model 26 handgun. At the 1147 Antioch Pike address, they found a Glock model 26 handgun, ten trash bags each of which contained twenty-five one-pound baggies of marijuana, a ledger containing records of amounts paid and drugs shipped, eight one-pound bags of marijuana, and a shotgun. The bags for the marijuana were identical to the bags found in the Taurus occupied by Vasques and Alonzo.

The evidence found at the scene and at the two houses on Antioch Pike was secured, sealed, and sent to the lab for testing. TBI forensic chemist Donna Flowers testified that the marijuana in the Taurus weighed 93.8 pounds and that the marijuana confiscated at 1035 Antioch Pike weighed 250.5 pounds. TBI forensic scientist William H. Stanton, Jr., testified that the marijuana found at the 1147 Antioch Pike residence weighed 21.2 pounds.

State v. Vasques, 221 S.W.3d 514, 517-19 (Tenn. 2007).

The petitioner and the co-defendants were each convicted of conspiracy to possess with intent to sell more than seventy pounds of marijuana within one thousand feet of a school zone. They were each sentenced to fifteen years in the Tennessee Department of Correction.

A complex procedural history developed after the petitioner was sentenced and the motion for new trial was denied. He and the other co-defendants appealed to this court, raising several issues including the sufficiency of the evidence. See Roberto Vasques, 2005 WL 2477530, at *1. This court stayed the appellate proceedings after the defendants filed petitions for coram nobis relief with the trial court. Id. at *1. The petitions were filed after the TBI's lead investigator in this case revealed that he was addicted to cocaine and had tampered with evidence in other cases. Id. The trial court granted all of the petitions for coram nobis relief and vacated the convictions. Id. On appeal, this court affirmed the coram nobis judgments for only two of the defendants. Id. at *14. It reversed the coram nobis judgments for the petitioner and other co-defendants. Id. In its decision, this court also addressed the issues raised on direct appeal. It found that the petitioner's conviction was supported by sufficient evidence. Id. at *20-21. Additionally, this court considered the separate issue of whether a jury instruction should have been given for the lesser-included offense of facilitation. Id. at *22-25. The issue was reviewed under plain error analysis because the instruction was not requested at trial. Id. at *24. This court determined that a facilitation instruction was warranted. Id. at *25. It held, however, that the error was harmless beyond a reasonable doubt. Id. This court reasoned that the evidence "overwhelmingly" established that the petitioner was guilty of conspiracy. Id. The Tennessee Supreme Court affirmed this court's rulings. Vasques, 221 S.W.3d at 529.

The petitioner filed a pro se petition for post-conviction relief. The petition raised several claims, including ineffective assistance of counsel and selective prosecution. The ineffective assistance of counsel claim was based in part on trial counsel's failure to request a jury instruction on the lesser-included offense of facilitation. The petition also alleged that trial counsel should have investigated improper communications between the prosecutor and a juror. The petitioner retained an attorney, and several amended petitions were filed. The allegations in the petitions were addressed at a post-conviction hearing. The petitioner was represented by counsel at the hearing.

**Post-Conviction Hearing**. The petitioner's father, Candelario Alonzo,[3] testified that he was present during the petitioner's trial. While in the courtroom, Candelario noticed that one of the jurors was communicating with the prosecutor. The juror was seated in the jury box, and the prosecutor was at the prosecutor's table. Candelario said the juror and the prosecutor were giving "some hand signals." Candelario recalled that the juror gave the thumbs-up signal. The hand signals were made while the judge was outside of the courtroom. Candelario said he could not tell whether the prosecutor made eye contact with the juror. Candelario described a second incident in which he saw the same juror have a conversation with the prosecutor. This conversation, which took place in a passageway

---

[3]For purposes of clarity, Candelario Alonzo shall be referred to by his first name.

behind the jury box, occurred after the trial was adjourned for the day.[4] Candelario said he spoke to trial counsel and the petitioner about both incidents. He expected trial counsel to raise the matters before the trial court. On direct examination, Candelario did not provide clear testimony about when he informed trial counsel of the improper communications between the prosecutor and the juror. He said he spoke to trial counsel about some of the "stuff" during trial. Candelario explained that he did not tell trial counsel about "the other stuff" until after the trial. On cross-examination, Candelario clarified that he spoke to trial counsel about the hand signals on the day they happened. He waited until the following morning to tell trial counsel about the conversation in the passageway. Candelario said he was unable to discern the substance of the communications between the juror and the prosecutor.

Reed Poland, a criminal defense attorney, testified that he did not represent the petitioner and was not familiar with the facts of this case. Poland was asked about a hypothetical scenario in which a defense attorney is informed that a prosecutor had improper communications with a juror during trial. Poland stated the proper course of action for the defense attorney would be to contact the trial judge and move for a mistrial.

The petitioner testified that he initially received appointed counsel. His father chose to retain a different attorney, trial counsel, about three or four months before trial. The petitioner stated that during trial, his father informed him of the communications between the juror and the prosecutor. The petitioner said he personally saw the juror smirk and make hand gestures in the jury box. He alerted trial counsel to the situation by passing her notes. In the notes, he asked trial counsel to bring the prosecutor's actions to the trial court's attention. Trial counsel, however, never raised the issue of prosecutorial misconduct. The petitioner said he spoke to trial counsel twice about the prosecutor's communications with the juror. She responded by stating that she had not seen any misconduct. On the day after the trial ended, the petitioner filed a complaint against trial counsel with the Board of Professional Responsibility. He acknowledged that this complaint was unsuccessful. The petitioner testified that his father informed him of the conversation in the passageway between the prosecutor and the juror. The petitioner claimed he told trial counsel about this incident as well. He said the juror who communicated with the prosecutor was the jury foreman.

Trial counsel testified that she was hired to represent the petitioner a couple of months before trial. She said the petitioner wanted to go to trial. He rejected a plea deal even though she explained that the likelihood of a conviction was high. Trial counsel discussed the allegations of prosecutorial misconduct:

---

[4]Candelario made clear that the conversation did not occur after the trial ended.

There has been testimony that there was eye contact between [the prosecutor] and a juror. And then there was testimony that there was . . . an observed but unheard conversation between [the prosecutor] and a juror. As to the gestures or eye contact, not only did Mr. Alonzo bring that to my attention, but I have also observed that there was one particular juror that was quite engaged in the proceeding throughout voir dire and throughout all of the trial[.] I had noticed that he made a lot of eye contact with, I'll say the state's table, because I don't know exactly who he was looking at. He made a lot of eye contact with the defense table, including myself. I never saw him make a hand gesture or do anything that was inappropriate, but . . . I do recollect and I had this conversation with Mr. Alonzo that we had a juror who was very interested in the proceeding.

Trial counsel said she chose not bring the matter to the trial court's attention because she witnessed no improper communications between the State and the juror. Trial counsel stated:

When the client brought it to my attention, I had already noticed it throughout the trial. So he was not bringing anything to my attention that I did not see. And I told him exactly what I've testified that I'd seen it from the beggining [sic], nothing that looked any different than any other trial for someone paying attention.

Trial counsel denied that the petitioner or his father mentioned that the prosecutor had a conversation with the juror. She claimed she would have acted on this information if it had been provided.

Following the proof at the hearing, the post-conviction court denied the petition by written order. The post-conviction court rejected the ineffective assistance of counsel claim. It found that the petitioner was not prejudiced by the absence of a jury instruction on facilitation. The post-conviction court referred to the appellate court's determination that the failure to include a facilitation instruction was a harmless error. It stated that the conviction for conspiracy was supported by overwhelming evidence. Next, the post-conviction court rejected the claim that trial counsel was ineffective based on her failure to investigate the alleged prosecutorial misconduct. It first considered the allegation that the prosecutor and the juror communicated by hand gestures in the courtroom. The post-conviction court credited trial counsel's testimony that she was unaware of any hand gestures. The post-conviction court stated that even if trial counsel was alerted to the hand gestures, there was a "paucity of proof" regarding the prosecutor's attempts to communicate with the juror. Consequently, prejudice could not be shown because the trial court would have dismissed any claim of prosecutorial misconduct. The post-conviction court then addressed the allegation that the prosecutor and the juror had a conversation in the passageway behind the

jury box. It credited trial counsel's testimony that she was not informed of this conversation; therefore, trial counsel had no obligation to raise the issue with the trial court. The post-conviction court concluded that the petitioner failed to prove deficient performance or prejudice. The claim of selective prosecution was not addressed by the post-conviction court.

The petitioner appealed the decision of the post-conviction court by filing a notice of appeal.[5]

## ANALYSIS

**I. Ineffective Assistance of Counsel**. The petitioner claims he received ineffective assistance of counsel based on two grounds. First, he argues that trial counsel failed to request an instruction on the lesser-included offense of facilitation. The petitioner refers to the appellate decisions on direct appeal which held that a facilitation instruction was warranted. He contends he would have been convicted of facilitation had a proper jury instruction been given. The petitioner also claims trial counsel's failure to contest the jury instruction unfairly subjected him to the demanding standard of plain error review on appeal. Second, the petitioner argues that trial counsel was ineffective based on her failure to investigate improper communications between the prosecutor and a juror. He contends the evidence showed that trial counsel was alerted to these communications, but took no action to address the issue.

In response, the State claims the record supports the denial of post-conviction relief. It asserts that the petitioner was not prejudiced by the omitted facilitation instruction. The State points to this court's determination on direct appeal that any error regarding the instruction was harmless. The State also argues that trial counsel was under no duty to raise the alleged prosecutorial misconduct. It contends the post-conviction court "properly [credited] the testimony of trial counsel that she was unaware of any inappropriate conduct or any ground for a mistrial." Upon review, the petitioner is not entitled to relief based on ineffective assistance of counsel.

**Standard of Review**. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

---

[5]We note that the notice of appeal was untimely. The notice of appeal states that it was submitted on December 28, 2009, which was within the thirty-day filing period. However, the stamped filing date was from January 7, 2010, which was outside of the filing period. See T.R.A.P. 4(a). Rule 4(a) of the Tennessee Rules of Appellate Procedure provides that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." We believe the "interest of justice" is best served by waiving the filing requirement and addressing the merits of the petitioner's appeal.

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

In viewing the record, the post-conviction court properly rejected the ineffective assistance of counsel claim. The petitioner has not shown that he was prejudiced by trial counsel's failure to request a jury instruction on facilitation. In order to prove prejudice, the petitioner needed to establish a reasonable probability that the result of his trial would have been different if the facilitation instruction was given. Id. at 370. As noted by the post-conviction court, this court already determined that, in light of the overwhelming evidence

of conspiracy, the omission of the facilitation instruction was a harmless error. Roberto Vasques, 2005 WL 2477530, at *25. We likewise conclude that the evidence in this case strongly supported a conviction for conspiracy. The petitioner, therefore, was unable to prove that he was prejudiced by the omitted facilitation instruction.

The petitioner's claims regarding the two instances of prosecutorial misconduct are also without merit. We shall first address the allegation that the prosecutor communicated with a juror by making hand gestures in the courtroom. The post-conviction court credited trial counsel's testimony that she did not witness any improper communications. It ultimately rejected the petitioner's claim based on the scant testimony regarding the prosecutor's alleged misconduct. We agree that the record contains insufficient proof that trial counsel needed to raise this issue before the trial court. Trial counsel testified that she observed the conduct at issue and did not see anything improper. Furthermore, the petitioner and his father provided no detail about the prosecutor's actions, other than the general assertion that the prosecutor made hand gestures. The petitioner's father even acknowledged that he could not tell whether the prosecutor made eye contact with the juror. Based on the testimony at the post-conviction hearing, we cannot conclude that the petitioner presented clear and convincing evidence that trial counsel needed to bring this issue to the trial court's attention.

The second allegation of prosecutorial misconduct concerned the conversation between the prosecutor and the juror in the passageway behind the jury box. The post-conviction court credited trial counsel's testimony that she was never informed of this conversation. This testimony contradicted claims by the petitioner and his father about how trial counsel was informed of the conversation. The post-conviction court found that trial counsel was the more credible witness, and we will not override its decision. See Vaughn, 202 S.W.3d at 115. Because trial counsel was not informed of the conversation between the prosecutor and the juror, she was under no duty to address the issue.

The petitioner has not shown that trial counsel's representation was deficient or that he suffered any resulting prejudice. Consequently, the post-conviction court properly denied the claim of ineffective assistance of counsel. The petitioner is not entitled to relief on this issue.

**II.  Selective Prosecution**. The petitioner argues that the post-conviction court abused its discretion by not allowing him to raise the issue of selective prosecution. He claims he was prosecuted for committing the offense in a school zone based on his ethnicity. The petitioner asserts, "Tennessee State has a history of prosecuting only minorities (i.e, African Americans and Hispanic Americans) for violation of school zone offenses in previous years, while not prosecuting Caucasian Americans for the same offenses." In response, the State argues that the petitioner was not denied the opportunity to raise this issue

before the post-conviction court. The State also contends the petitioner's claim is without merit.

In viewing the record, we conclude that this issue is waived. The petitioner's brief does not specify where in the record the post-conviction court prohibited him from raising the selective prosecution claim. The petitioner was obligated to make appropriate references to the record in setting forth his argument. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Furthermore, our review of this issue would be improper because it could have been raised on direct appeal. T.C.A. § 40–30–106(g).[1] The petitioner is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

---

[1]The petitioner claims the post-conviction proceeding was the appropriate forum because the revelations about the wayward TBI agent did not surface until after the direct appeal was filed. The prosecution of a single individual would not form the basis of a selective prosecution claim. Therefore, we must disagree with the petitioner's assertion that he "had no way of raising or arguing this issue prior to the Post-Conviction hearing[.]"